UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION



**FILED**
NOV 0 4 2009
CLERK

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| | * | |
| UNITED STATES OF AMERICA, | * | CR. 09-40052 |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | REPORT AND RECOMMENDATION |
| | * | (Motion to Suppress) |
| WALTER PERRIN, | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Pending is Defendant's Motion to Suppress Statement (Doc. 24 ). A hearing was held on Thursday, October 22, 2009. Defendant was personally present and represented by his counsel of record, Assistant Federal Public Defender Timothy Langley. The Government was represented by Assistant United States Attorney Jeff Clapper. Four witnesses testified at the hearing: Sioux Falls Police Department Detective Sean Kooistra, ICE Special Agent Craig Scherer, Federal Public Defender Investigator Peter Zenner, and the Defendant's mother, Phyllis Perrin. Additionally, both parties have submitted briefs and oral argument was heard at the conclusion of the hearing. Based on a careful consideration of all of the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## RECOMMENDATION

It is respectfully recommended that Defendant's Motion to Suppress be **DENIED.**

## JURISDICTION

Defendant is charged in an Indictment with Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and 2256(8). The pending Motion to Suppress was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Judge Piersol's Standing Order dated November 29, 2006.

## **FACTUAL BACKGROUND[1]**

The events which form the basis for Defendant's Motion to Suppress Statement occurred on the afternoon of June 2, 2008. On that date, the home where Defendant (Walter Perrin) resides with six other people was searched pursuant to a warrant which had been authorized by the undersigned a few days earlier. Four of the occupants of the home (including Walter Perrin)[2] were present during the search. ICE Agent Craig Scherer interviewed Walter while the search was underway. Agent Scherer did not advise Walter of the *Miranda* warnings. Walter asserts the interview was custodial and should be suppressed. The Government asserts that because the interview was not custodial, no *Miranda* warnings were necessary and Walter's statements should be admissible.

### **1.     Sioux Falls Police Detective Sean Kooistra**

Sean Kooistra is a detective with the Sioux Falls Police Department. He participated in the search of Walter's residence in Sioux Falls, South Dakota, on June 2, 2008. He identified Walter's bedroom on a diagram of the home (EX Q) which was introduced into evidence. He estimated Walter's room is approximately ten feet from the living room. Detective Kooistra came into Walter's bedroom at Agent Scherer's request. Kooistra searched the room for computers and media storage devices. He observed Agent Scherer enter the room and begin to question Walter, but Kooistra did not participate in the interview. The door to the bedroom was slightly open. Kooistra left the room before Scherer concluded the interview. While Kooistra was present he did not observe Agent Scherer raise his voice, threaten or physically touch Walter, or make any promises to him.

Kooistra estimated the search lasted one hour and fifteen minutes. Nobody was arrested at the conclusion of the search. To the best of his recollection, the occupants of the home remained in

---

[1]The facts will be presented as they were portrayed by the various witnesses. As will become apparent, there are discrepancies in the versions of events as presented by law enforcement versus Ms. Perrin.

[2]Three people whose surname is Perrin reside at the home that was the subject of the search warrant: the Defendant (Walter) his mother (Phyllis) and his brother (David). For ease of reference, therefore, the Defendant will be referred to by his first name throughout this Opinion.

the living room during the entirety of the search. He did not converse with any of the occupants. His only purpose was to participate in the search.

## 2. ICE Agent Craig Scherer

Craig Scherer is a Special Agent for the United States Department of Homeland Security, Immigration and Customs Enforcement (ICE). He became involved in the investigation when he received information from an undercover South Dakota DCI Agent who had downloaded child pornography from a computer located inside the subject residence. Based on that information, Scherer obtained a search warrant to search the residence.

Agent Scherer explained his standard procedure for searching an occupied residence as follows: He knocks and announces the presence of law enforcement and that a search warrant is being executed. Upon entering the residence, all occupants are located and brought to a central location for officer safety purposes. The central location where the occupants are located is searched first to assure there are no weapons accessible to the residents; then they are advised why the officers are there.

In this case, Agent Scherer was the lead case agent. The search of the Perrin residence began at 1:45 p.m. Six law enforcement officers entered the home (three ICE Agents including Agent Scherer, two DCI Agents, and Detective Kooistra). There were also Sioux Falls Police Officers outside the home to secure the perimeter, but they did not come inside. Initially, Agent Scherer was dressed in his ballistic vest, but he took the vest off as soon as the residence was deemed safe (less than five minutes after the search began). When the team entered the home, thee people were found in the living room area. Scherer recalls first encountering Terry Boll in the living room. A female (Tina Hempel) was in one of the bedrooms. She was brought to the living room. The other agents cleared the remainder of the house including the basement. Scherer explained that whomever went through the house probably yelled "search warrant!" as they went, to alert any people who might be in the house to what was going on. No other people were found in the house. Several photos were admitted into evidence during the hearing. *See* EX 1-10. These photos were taken during the June 2 search.

3

After all four of the people who were home at the time of the search were gathered in the living room, Agent Scherer addressed them as a group. He provided Phyllis Perrin with a copy of the search warrant which he retrieved from his vehicle. He advised the group of the nature of the search warrant and why law enforcement was present. He explained the officers were looking for child pornography that had been downloaded from a computer inside the house. He explained to the group that they were free to leave, were not under arrest, and that he would like to ask them some questions but they did not have to answer. He asked if they understood and they verbally indicated they did. Agent Scherer told the group that although they could leave, if they decided to stay they would be required to stay in the living room for the duration of the search. An officer remained in the living room with the group during the search.

Agent Scherer collected general biographical information (names, dates of birth) from each person present. He also asked each person which bedroom was theirs (the diagram of the home shows three bedrooms) or where they slept and where they kept their belongings. After obtaining that general information Scherer informed the group there had been an undercover investigation, and that an undercover agent had downloaded child pornography images from a computer located within the home. He asked about internet connections and wireless setups for the internet. He asked generally whether anyone in the home used "Limewire." Terry Boll and Walter responded affirmatively. Walter became visibly nervous during the group conversation about child pornography and computer usage.[3] He avoided eye contact with Scherer, he slumped down in his chair and became fidgety. Scherer asked Walter if they could speak privately in Walter's bedroom. Walter said "yes" and walked with Agent Scherer toward Walter's bedroom. Agent Scherer did not touch Walter or physically force him to go. The bedroom was ten or fifteen feet from where Walter had been sitting in the living room.

Agent Scherer estimated approximately five minutes had passed from the time he began

---

[3]The photos taken simultaneously with Agent Scherer's group information gathering session in the living room reveal the room was very crowded. Four occupants of the home, at least two law enforcement agents, and two dogs were all in the very modestly sized room which contained a day bed, chest of drawers, computer stand, step-stool, baker's rack and two chairs, in addition to among other things, several stuffed animals, a thermometer, two fans, children's artwork, Christmas decorations, and likenesses of Jesus, Tweety Bird, and Elvis.

speaking to the group in the living room until the time he asked Walter to speak privately in Walter's bedroom. As they were walking to Walter's room, Scherer asked Detective Kooistra to accompany them. Detective Kooistra accompanied Scherer and Walter to Walter's room, but Kooistra left before Scherer and Walter finished talking. Agent Scherer did not close the door. The door was "almost closed" but not completely closed while he talked to Walter. Scherer did not repeat the admonitions about being free to leave and not being required to answer questions once he and Walter went into the bedroom to speak privately, because he had just advised Walter of those same things moments earlier in the living room. Scherer asked Walter about internet usage and child pornography, but did not accuse Walter of possessing child pornography. Scherer questioned Walter for approximately ten minutes. Scherer did not perceive that Walter had any trouble understanding the questions Scherer was asking him, because Walter's answers were consistent and reasonable with the questions. Scherer did not perceive anything unusual about Walter's mental condition. Scherer did not threaten or make physical contact with Walter during the interview. He did not raise his voice or make any promises to Walter. Scherer did not observe that Walter was upset when they left the room. He did not arrest Walter at the conclusion of the interview or at any time that day.[4]

Next, Agent Scherer asked to speak with Phyllis Perrin. Scherer perceived from the group interview that Phyllis was the head of the household and that she was upset about the presence of law enforcement and the search of her home. Scherer thought Phyllis deserved to know who was responsible for the situation. Agent Scherer told Phyllis that her son had something to tell her. Phyllis and Walter spoke together in the dining room (which according to EX Q is directly across from Walter's bedroom). The gist of the conversation between Phyllis and Walter was that Walter was responsible for the presence of law enforcement in the home that day. Scherer also visited with Phyllis and Walter about Walter's mental well-being after the search, as is Scherer's usual practice. Scherer does not recall another officer directing Phyllis and Walter to return to the living room, but he agreed it could have happened. Scherer does not recall speaking to the officer who was in the living room.

---

[4]The record reflects Walter Perrin not arrested until nearly a year later. He was indicted on April 7, 2009. A warrant was issued for his arrest the next day, and he was arrested on April 14, 2009. He appeared and was released on conditions that same day (April 14, 2009).

5

The entire search lasted one hour and fifteen minutes. Scherer knows this because the inventory log which Phyllis Perrin signed at the end of the search indicates it was signed at 3:00 p.m.

### 3. Federal Public Defender Investigator Peter Zenner

Mr. Zenner obtained photographs of the Perrin residence which were not taken simultaneously with the search but were received into evidence without objection. *See* EX D-P. EX D-F depict the exterior of the home. EX G-L depict the living room. EX M-P depict Walter's bedroom. Mr. Zenner also requested and received documentation from the Sioux Falls School District regarding Walter. The documentation consists of a psychological report dated October 1999 (EX A) and a Medical-Social Assessment dated 1996 (EX B).[5] Mr. Zenner also arranged for R.P. Ascano, Ph.D. to evaluate Walter's intellectual functioning. EX R is a copy of Dr. Ascano's CV. EX S is a copy of the report produced by Dr. Ascano regarding Walter's current intellectual functioning. The Government objected to EX R and S on the same bases as it did EX A and B, and the objections are overruled for the same reasons. EX R and S are received.

### 4. Phyllis Perrin

Phyllis Perrin is Walter's mother. Walter is currently 26 years old and has always lived with Phyllis. He's had the same job since high school–as a fry cook at TC's Referee restaurant. Walter was in special classes throughout grade school, middle school and high school. Phyllis had to attend meetings at his schools regarding his Individual Education Plans (IEPs).

---

[5]The Government objected to the admission of these exhibits on three grounds: hearsay, foundation and relevance. The objection is overruled and the exhibits are received. The usual hearsay rules and other rules of evidence are relaxed for purposes of suppression hearings. *United States v. Boyce*, 797 F.2d 691 (8th Cir. 1986); Fed. R. Evid. 104(a) and 1101(d)(1). Although the documents qualify as business records under Fed. R. Evid. 803(6), they were not provided under seal. They were authenticated, however, pursuant to Fed. R. Evid. 901 when Mr. Zenner testified he obtained the documents directly from the Sioux Falls School District and that they are what the Defendant claims them to be. The Court acknowledges *Crawford v. Washington*, 541 U.S. 36 (2004). In this instance, however, the Sixth Amendment is not violated by the admission of the Defendant's proposed evidence at this suppression hearing. *See, United States v. Waldron*, 2007 WL 2080520 (D.S.D.).

The Government's most worthy objection is relevance because the information contained in the documents is nearly ten and thirteen years old, respectively. Because this matter is before the Court, not a jury, the age of the information will be taken into consideration when determining the weight to be assigned the information in EX A and B, not its admissibility.

6

On the date the search warrant was executed, seven people (Walter Perrin, David Perrin, Phyllis Perrin, Terry Boll, Tina Hempel, Michael Straw and Deb Corbett) lived in her house. She estimates law enforcement personnel arrived at the home at 1:30 p.m.[6] Terry Boll was on his way out the door to a "spot job" when law enforcement was on their way in. She did not hear them knock on the door; when Terry opened it, they came in and hollered "search warrant!" They asked Terry to come back into the house. Walter and Tina were also present at the house. Walter was already in the living room. The officers asked Tina to come out of her bedroom into the living room.

The officers were wearing police vests. Phyllis disputes that Agent Scherer had a police vest on at any time that day. They asked who was in the house, and which bedroom belonged to whom. Agent Scherer "briefly" explained why he was there. He said it involved child pornography, drugs, and illegal aliens. Phyllis insists Agent Scherer told her he was looking for all of those things.[7] Phyllis disputes that Agent Scherer ever told the group they were not under arrest. She also disputes that Agent Scherer asked questions of the group after he determined which room each person occupied. She first disputed there was any discussion about the use of the internet or Limewire, but then conceded there "might" have been a discussion about who had access to the internet. Phyllis opined the officers obtained that information earlier from Michael Straw while he was at his workplace. She doesn't know whether both Terry and Walter admitted using Limewire during the time the group was assembled in the living room. She remembers "most of" what was said in the living room but admits she is not quite sure of all the words that were exchanged. Phyllis is adamant, however, that Agent Scherer did not tell the group they did not have to answer his questions.

_____

[6]In his brief, Walter disputes the Government's claim that the search was concluded by 3:00 p.m. as evidenced by the inventory form which was signed by Phyllis at that time on the inventory log form. Walter's theory is that Agent Scherer, because he mistakenly wrote "2006" instead of "2008" on the form, must have also mistakenly written "1500" instead of "1600" (military time for 3:00 instead of 4:00). The problem with Walter's theory is that all the witnesses who testified at the evidentiary hearing, including Phyllis, agreed that the search was concluded and law enforcement left at 3:00.

[7]Although Phyllis asked for a copy of the search warrant, she did not read it right away upon receipt. A friend read it to her later. Phyllis recalls the friend told her the warrant authorized a search for drugs and illegal aliens in addition to child pornography.

The officers started looking through the bedrooms, and the four occupants stayed in the living room. Phyllis does not recall anyone telling them they could leave. She recalls being told to stay in the living room. She does not recall which officer told them to stay in the living room. One officer remained in the living room by the hallway during the search. He stood for a while, then she gave him a stool to sit on.

Phyllis asked for a copy of the search warrant "numerous times." She estimates the search had been underway for a half hour before one of the agents went outside and got a copy of the warrant for her. During that time, all the occupants were in the living room. Then "Craig" came in and asked Walter to come into his room. Phyllis does not remember the exact words Agent Scherer used which prompted Walter to leave the living room and accompany Scherer to the bedroom, but she "felt" Walter was told to leave the room. When pressed about why she felt that way, Phyllis said "he just asked him to leave the room." When pressed further about the words Agent Scherer used, Phyllis recalled "Walter you need to come with me." Phyllis admits that Agent Scherer never physically touched Walter, verbally threatened him, or made any promises to him.

When Agent Scherer and Walter came out of the bedroom Agent Scherer asked Phyllis to come and speak with Walter. Agent Scherer told her some people commit suicide after something like this, but he did not believe Walter was a threat. Scherer suggested that Walter and Phyllis speak to each other in the dining room, but another officer told them to return to the living room. The officer who had been in the living room was still there, and was by then speaking to Agent Scherer. That officer then told them, for the first time, that they could leave the living room if they wished.

## DISCUSSION

As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. *United States v. Phillips*, 540 F.2d 319 (8th Cir.1976). The Government, however, bears the burden of proving by a preponderance of the evidence that Miranda warnings were either not necessary or that they were given and effectively waived. *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966); *United States v. Short*, 790 F.2d 464, 467-68 (6th Cir. 1986); *United States v. Charbonneau*, 979 F.Supp. 1177, 1181 (S.D. Ohio 1997).

## 1. Whether the Interview was Custodial

Defendant seeks to suppress the statements he made to Agent Scherer because he was not advised of his *Miranda* rights prior to his interview with him. *Miranda* warnings are required prior to a custodial interrogation. An individual is in custody when he has been formally arrested or his freedom of movement has been restrained to a degree associated with a formal arrest. Relevant inquiries are whether the suspect is free to leave the scene, the purpose, place, and length of the questioning, and whether a reasonable person in the suspect's position would have considered himself to be in custody. The mere fact that an investigation has focused on a particular suspect does not trigger the need for *Miranda* warnings in noncustodial settings. *United States v. Goudreau*, 854 F.2d 1097, 1098 (8th Cir. 1988) (citations omitted). Also, "[i]n determining whether a suspect is 'in custody' the relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *United States v. Carter*, 884 F.2d 368, 370 (8th Cir. 1989)(citations omitted). In other words, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Thatsaphone v. Weber*, 137 F.3d 1041, 1045 (8th Cir. 1998) (citations omitted).

For many years, the Eighth Circuit relied on the various indicia of custody defined in *United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990). They are: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning. In *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004), however, the Eighth Circuit cautioned the *Griffin* factors are by no means exhaustive and should not be applied "ritualistically." The Court emphasized "an express advisement that the suspect is not under arrest and that his participation is voluntary" is the most obvious and effective means of demonstrating he has not been taken into custody. *Id.* at 826. Nonetheless, the *Griffin* factors still appear in Eighth Circuit case law after *Czichray*, and continue

9

to be cited with approval for determining the custody issue. *See e.g. United States v. Plumman*, 409 F.3d 919, 923 (8th Cir. 2005).

Defendant cites *United States v. Carter*, 884 F.2d 368 (8th Cir. 1989) in support of his assertion that his interview was custodial and should be suppressed because no *Miranda* warnings were given. In *Carter* the suspect was interviewed in his boss's office for an hour and half. He was not told that he was free to leave or that he did not have to answer the officer's questions. *Id.* at 372. During the interview he offered to show the officers his work station but they declined and told him to "just stay here." *Id.* It was the suspect's first experience with the legal system. *Id.* He was questioned for an hour before he confessed. *Id.*

Before comparing *Carter* and the other relevant case law to the facts of this case, some of the discrepancies between Phyllis's recollection of events and law enforcement's recollection of events must be resolved. The first disputed issue is the length of time law enforcement was present in the home, and therefore, the outside parameters of the length of Walter's interview. Boiled down, however, there really is not much dispute. Kooistra and Scherer testified the search lasted from 1:45 to 3:00 p.m. Phyllis testified the search lasted from 1:30 to 3:00 p.m. The difference is only fifteen minutes. Only Scherer, however, provided any testimony about how long Walter's individual interview lasted–ten minutes. Phyllis did not dispute Scherer's testimony on that point.

The next issue is whether, once law enforcement agents had gathered the residents of the home in the living room, Agent Scherer advised them of the *Griffin* warnings as a group before he requested a private interview with Walter in the bedroom. Phyllis insisted Agent Scherer did not advise the group of the *Griffin* warnings during the initial group meeting in the living room, but instead that nobody told them they were free to leave until after Scherer had interviewed Walter in the bedroom. It is more likely that Scherer's recollection of what was said during the initial group meeting is more accurate. Phyllis was understandably shaken and surprised when six uniformed, armed law enforcement officers unexpectedly arrived at her home on June 2, 2008. Her memory of what happened during the search–especially the first few moments–is more likely to be incomplete or confused. A few examples are these:

• Phyllis initially denied Agent Scherer asked any questions at all in the living room after he

10

obtained biographical information from the residents but before he and Walter exited to Walter's bedroom. She later, however, admitted Agent Scherer "might have" asked about who had access to the internet.

- She did not know where Agent Scherer obtained the information that Walter and Terry Boll both used Limewire file sharing services (Agent Scherer testified it was during the same group conversation in which he advised of the *Griffin* warnings);

- She said she remembered "most of" the conversation in the living room, but was not quite sure of all the words that were used;

- She insisted Agent Scherer told her, and her friend's later reading of the warrant reaffirmed, that the purpose of the search was to look not only for child pornography, but also for drugs and illegal aliens.[8] Because the warrant did not authorize a search for drugs or illegal aliens, Phyllis obviously mis-remembered the content of her friend's reading of the warrant and/or confused some portion of a conversation with Agent Scherer about his general ICE duties with his recitation of the purpose of his presence in her home on that particular day.

For these reasons, I find that Agent Scherer's memory is more accurate regarding what occurred and what was said in the living room before Walter and Agent Scherer's private conversation in Walter's bedroom. I find, therefore, that Agent Scherer did recite the *Griffin* warnings to Walter, Phyllis, Terry Boll and Tina Hempel within the first several minutes of the search.[9]

That the *Griffin* warnings were given, however, does not end the inquiry. Walter raises two other issues. The first is Walter's contention that his intellectual capability must be considered when

---

[8]As mentioned earlier, the warrant was authorized by the undersigned. It is on file in the clerk's office. It was reviewed in preparation for drafting this opinion. Nowhere (in the supporting affidavit which outlines Agent Scherer's general duties and qualifications or in the warrant itself) does the warrant mention illegal aliens or drugs.

[9]The defense cited as an inconsistency in Agent Scherer's testimony the fact that he first testified he "immediately" gave a copy of the warrant to Phyllis upon entering the house. He did not so testify. He testified he brought Phyllis a copy of the warrant after the group had been gathered in the living room and the house had been secured. On cross examination, Agent Scherer noted that the amount of time that passed between entering the house and returning to his vehicle to get the warrant for Phyllis could not have been more than seven minutes, based on the time stamp on the photo . The court does not perceive Scherer's direct and cross-examination testimony as conflicting.

deciding whether a reasonable person in his shoes would have considered himself to have been formally arrested or his freedom of movement been restrained to a degree associated with a formal arrest. The second is the effect of the setting (a search warrant being conducted in Walter's home while he was interviewed) would have had upon a reasonable person in Walter's shoes regarding whether he had been formally arrested or his freedom of movement been restrained to a degree associated with a formal arrest.

## A.    Walter's Intellectual Functioning

"Whether [a defendant] was in custody is not a matter of his own subjective belief, but turns on whether a reasonable person in his shoes would have felt free to end the interview." *United States v. Ollie*, 442 F.3d 1135, 1137 (8th Cir. 2006). Defendant asserts in his brief that

the Court must . . . consider all of the particular features of the situation and of a defendant's makeup which determine what it means to be in the defendant's shoes. When the Court asks whether a reasonable person in this case would have felt himself free to end the interrogation and leave, *it is not a reasonable person in the abstract, but a reasonable person with the characteristics and history of Walter Perrin facing the situation Walter Perrin faced on June 2, 2008: a person of sub-average intellectual functioning . . .*

(Emphasis added). *See*, Defendant's Legal Memorandum in Support of Motion to Suppress, Doc. 25, p. 7. In support of this assertion, counsel provided Walter's junior high and high school records (EX A and B) which indicate at that time IQ testing placed him in the 30th percentile. In other words, his overall functioning was equal to or better than thirty percent of his peers. Dr. Ascano's report (EX S) represents an updated view of Walter's intellectual functioning. Dr. Ascano performed an IQ test which ranks Walter in the 9th percentile and opines Walter remains in the "sub average range" of intellectual functioning.

The Government does not seriously dispute that Walter has a low IQ. It asserts, however, that Walter understood what was going on and that whatever his intellectual impairments were, they were not apparent to Agent Scherer. Scherer testified that Walter answered questions reasonably and appropriately. The Government asserts that in any event, Walter's IQ is not relevant to the

12

custody issue.[10] The Court agrees. "We do not ask police officers to consider . . .contingent psychological factors when deciding when suspects should be advised of their *Miranda* rights." *Yarborough v. Alvarado*, 541 U.S. 652, 667- 668. 124 S.Ct. 2140, 2151, 158 L.Ed.2d 938 (2004). *See also, United States v. Galceran*, 301 F.3d 927, 929 (8th Cir. 2002). ("We measure *Miranda's* custody requirement objectively, evaluating how a reasonable person in the suspect's position would have understood the situation. For the purpose of this evaluation, a reasonable person does not have a guilty state of mind or peculiar mental or emotional conditions that are not apparent to the questioning officer."). For these reasons, the level of Walter's intellectual functioning is not relevant and not considered in determining whether he was in custody when he gave statements to Agent Scherer on June 2, 2008.

## B.    Search Warrant Conducted in the Home During the Interview

Next, Walter asserts particular consideration should be given to the circumstance in which Walter found himself. Specifically, he asserts that because he was interviewed in isolation in his own home while the home was being searched by several uniformed, armed law enforcement officers the scale should be tipped toward a finding of a custodial interview. Walter cites *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008) as authoritative. That case and others from the Eighth Circuit and other jurisdictions will be compared.

Both parties have cited *United States v. Czichray*, 378 F.3d 822 (8th Cir. 2004) as authoritative to determine the custody issue. Although the home was not being searched in *Czichray*, the defendant was interviewed in his own home. In *Czichray*, two FBI agents arrived at the defendant's home at 6:30 a.m. The defendant was asleep and not dressed when they arrived. They called him on the telephone and told him to answer the door. When he did, the agents informed the defendant he did not have to speak with them. He allowed them in, and was subsequently interviewed for seven hours. During that time the agents repeatedly informed the defendant the interview was voluntary and that he could ask the agents to leave. He did not terminate the

---

[10]Defendant does not assert that his statements were involuntary, which is an entirely different inquiry and which does include consideration of the suspect's intelligence. *See Yarborough v. Alvarado*, 541 U.S. 652, 667- 668, 124 S.Ct. 2140, 2151, 158 L.Ed.2d 938 (2004).
.

13

interview. During the interview, however, the agents prohibited the defendant from answering the phone, and accompanied him when he moved about the house. In *Czichray* the Eighth Circuit noted that when a defendant is interviewed on his "own turf" the surroundings are "not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." *Czichray*, 378 F.32d at 826. The *Czichray* court found that "placing certain ground rules on an interview does not preclude a reasonable person from foregoing the interview altogether." *Id.* at 828. The *Czichray* Court found the interview non-custodial.

The defendant was interviewed during the execution of a search warrant for child pornography in his home in *United States v. Axsom*, 289 F.3d 496 (8th Cir. 2002). When nine agents arrived at 6:45 a.m. to execute the warrant, the defendant was not dressed. Several weapons were observed in the home. The defendant was escorted to his room to dress. He was informed he was not under arrest, and that the FBI agent "would like to talk to him, if he would like to speak with her." The defendant was interviewed for an hour. When he tried to leave the room to get a drink, the agent said "hold on just a minute," asked him what he needed, and got the drink of water for him. When the defendant needed to go to the bathroom, he was accompanied by an escort for security reasons. The Eighth Circuit held the interview was not custodial. "Although evidence exists to support the district court's finding that agents restrained [the defendant's] freedom of action, his freedom was not restrained to a degree associated with formal arrest." *Id.* at 502. The Court found that from an objective viewpoint, a reasonable person should have realized the agents restricted his actions to "protect themselves and the integrity of the search." *Id.* at 503. The Court also found significance in the lack of coercive or deceptive conduct by the agents during the interview. "While the execution of the search warrant was certainly police-dominated, the interview . . was not." *Id.*

A search warrant was executed in the defendant's home during what the defendant argued was a custodial interview in *United States v. Sutera*, 933 F.2d 641 (8th Cir. 1991). The defendant was personally searched, and then asked if he would answer questions. He was informed he did not have to answer, was not under arrest, and could leave at any time. *Id.* at 646. The defendant was interviewed in the bedroom, away from the other occupants of the home. He was allowed to move about the home, except was not allowed to interfere with the search or use the phone. When he needed to retrieve something at a different location, he was not allowed to drive there himself; one

14

of the officers drove him and brought him back. The interview lasted one hour and the search lasted three and a half hours. The Court found the interview non-custodial. *Id.* at 647.

The Court found the following facts persuasive: (1) except for the initial frisk, no force was used to restrain the defendant or to compel him to answer questions; (2) on the contrary, he was informed he was not under arrest, did not have to answer questions, and he was free to move around or leave at any time; (3) defendant was "on his own turf." The facts which the Court specifically found to be *not* persuasive were: (1) six armed officers entered and searched the apartment and frisked the defendant; (2) defendant was prohibited from using the phone or his car during the search; (3) defendant was interviewed in isolation from the other occupants of the home; (4) defendant was accompanied by an officer when he left to retrieve the offsite information; (5) the officers used nonverbal expressions indicating the defendant was not free to leave. Despite these claims, the Court found "the record is devoid of any evidence showing conduct by the officers which would lead to the conclusion that [defendant] was in custody. *The officers were simply following routine police procedure in executing a search warrant."* *Id.* at 647-48 (emphasis added).

There was likewise a search underway when the defendant was questioned in his home in *United States v. Helmel,* 769 F.2d 1306 (8th Cir. 1985). In that case, the defendant was not home when law enforcement arrived, so they called him and asked him to come home. He complied. When he arrived, he was searched but not placed under formal arrest. The defendant's description of the scene was that he was "cornered" by several agents and "ordered' to the kitchen where he was interviewed for between forty-five minutes and two hours. (The government asserted he went willingly and could move about the house at will). The agents answered all incoming phone calls during the search. The defendant was specifically informed he was not under arrest. The Court found the interview as non-custodial. *Id.* at 1321.

A search for child pornography was underway in the defendant's home while he was interviewed in *United States v. Brobst,* 2007 WL 844706 (D. Mont.). In that case the defendant was not home when the officers arrived and began searching his home. He arrived while the search was in progress. One of the officers approached the defendant and said "you need to come with me." After he entered the house, an officer positioned himself in the doorway. The defendant encountered

15

two detectives when he entered the house. They advised him they had a search warrant, gave him a copy, told him they were looking for child pornography, and told him they had already found some. After the defendant admitted the pornography belonged to him, he was arrested. The Court, however, held that the brief pre-arrest interview was non-custodial. *See also, Id.* at \*5 (collecting cases).

A search for child pornography was also underway while the defendant was interviewed in his home in *United States v. Gaynor*, 2007 WL 1875651 (D. Conn.). In that case twelve officers searched the home–a few wearing "raid jackets." One of the officers ran up the stairs with his weapon drawn to where the defendant was located and "ordered the defendant to step away from the computer." *Id.* at \*1. The officer explained his presence, physically guided the defendant to another room and told him to wait there. After the other members of the search team had entered, the defendant and the officer moved to the dining room to talk. The officer told the defendant he was not under arrest, was free to leave, and was not obligated to answer questions. During the interview, an officer stood near the door to the dining room to control access to the room. After an hour, the defendant indicated he needed to leave for work and was permitted to do so–while the search was still underway. The Court found the interview was non-custodial. "Although [the defendant] was initially confronted by several law enforcement agents, at least one of whom had a weapon drawn and made physical contact with [the defendant] that was not enough to constitute a custodial situation when considered with the other circumstances......a measure of anxiety always results from police officers confronting an individual with a search warrant, but that is typically not enough to constitute custody for a *Miranda* analysis." *Id.* at \*3-4.

A search for firearms in the defendant's home was underway while he was interviewed in *United States v. Jones*, 933 F.2d 807 (10th Cir. 1991). Six FBI agents conducted the search while the occupants of the home were asked to remain in the living room; the search lasted for thirty minutes. While the defendant claimed he was told he could not leave, the Court found he was told he was free to leave during the search. The Court held the interview was non-custodial. *Id.* at 810.

A search for child pornography was underway when the defendant was interviewed in *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008). The warrant was executed at 8:40 a.m. by eight

law enforcement officers representing three different agencies. The FBI agents were wearing their "raid vests." *Id.* at 1078. One of the FBI agents interviewed the defendant during the search. She preceded the interview by telling the defendant he was not under arrest, he was free to leave, that any statement he might make would be voluntary, and that he would not be arrested that day. *Id.* The agent directed the defendant to a storage room in the house so they could have a private conversation. The door was shut and another agent stood against it. The interview lasted between twenty and thirty minutes. The FBI agent did not repeat the earlier admonitions once the trio reached the storage room. No threats or promises were made during the interview. The defendant later testified he did not feel free to leave because he would have had to move the agent standing in front of the door or would have had to ask him to move. He was not arrested at the conclusion of the interview. The Ninth Circuit held the interview was custodial. In reaching this conclusion the Court made several observations.

> The usual inquiry into whether the suspect reasonably believed he could leave the interrogation does not quite capture the uniqueness of an interrogation conducted within the suspect's home . . . if a reasonable person is interrogated inside his own home and is told he is free to leave, where will he go? The library? The police station? He is already in the most constitutionally protected place on earth. To be free to leave is a hollow right if the place the suspect cannot go is his own home. . . .a reasonable person interrogated inside his own home may have a different understanding of whether he is truly free to terminate the interrogation if his home is crawling with law enforcement agents conducting a warrant-approved search. He may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search. We must, therefore, consider how to apply the traditional *Miranda* inquiry to an in-home interrogation.

*Id.* at 1083-84. The Court concluded several factors were relevant: (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or threats; (3) whether the suspect was isolated from others; (4) whether the suspect was informed he was free to leave or terminate the interview, and the context in which such statements were made. *Id.* at 1084. The Ninth Circuit found the number of officers involved mitigated toward custody, even though only two were involved in the actual interview because "there are no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation." *Id.* Also, in *Craighead* the defendant testified he was unpersuaded the FBI agent who told him he was free to leave spoke for all the other agents who did not work for the FBI. The Court found it was objectively reasonable for the suspect to believe he was "under

17

guard" when he was interviewed in the storage room with the door closed and one officer leaning against the closed door. *Id.* at 1086. The Court also found significance in the fact that the FBI agent testified that no non-law enforcement personnel would have been allowed into the interview even if the suspect had asked. The Court noted that the FBI agent advised the suspect he was free to leave, the interview was voluntary, and he was not under arrest. These admonitions weighed against a finding of custody. *Id.* at 1087. The Court nonetheless held the interview was custodial; "most importantly, [the defendant] testified that the presence of agents from three different law enforcement agencies left him with doubt as to whether SA Andrews had the authority to pronounce him free to leave. He believed that if even if the FBI permitted him to leave the storage room, he might be confronted by members of the other two agencies and forbidden to leave the house. Before he could leave the room, [the defendant] would have had to deal with Detective Englander, who appeared to be guarding the door to the storage room." *Id.* at 1088. The final consideration was the physical characteristics of the interview location (an unfurnished storage room). "An interview conducted in a suspect's . . . bedroom might allow the suspect to take comfort in the familiar surroundings of the home and decrease the sensation of being isolated in a police-dominated atmosphere." *Id.*

## C. Totality of the Circumstances

Having compared the circumstances of the above-cited cases to the facts as recounted by the witnesses in this case, and using the *Griffin* factors as a guide, I find that Walter was not in custody at any time during the June 2, 2008 interview. (1) Agent Scherer informed Walter at the outset that he was not under arrest and was free to leave, and did not have to answer any questions. That Scherer did not repeat these admonitions a few moments later when he and Walter spoke privately in the bedroom does not change the result; (2) Walter was not restrained by the officers during the interview in the bedroom. Although his movement was restricted during the time in the home during the search, Scherer credibly testified that he told the occupants they were free to leave, but if they chose to stay they would be confined to the living room for the duration of the search. From an objective viewpoint, a reasonable person should have realized the agents restricted his actions to "protect themselves and the integrity of the search." *Axsom.* 289 F.3d at 503. "Although evidence exists to support the district court's finding that agents restrained [the defendant's] freedom

18

of action, his freedom was not restrained to a degree associated with formal arrest." *Id.* at 502. Also, while Walter was in the bedroom, the door was not completely closed and unlike *Craighead*, there was no testimony that anyone was blocking Walter's way out. (3) Although Walter did not initiate contact with the authorities, he did acquiesce in Scherer's request for an interview; (4) There was no evidence of strong arm tactics used during the interview; (5) the atmosphere of the search was police dominated but the atmosphere of Scherer's ten minute interview was not;[11] (6) Walter was not placed under arrest at the conclusion of the interview. He was arrested not arrested until nearly a year later after he was indicted by the grand jury.

Walter's comparison of his situation to *United States v. Carter*, 884 F.2d 368 (8th Cir. 1989) is not persuasive. The suspect in *Carter* was not told he was free to leave or that he did not have to answer the officers' questions. In *United States v. Czichray*, 378 F.3d 822 (8th Cir. 2004), the Eighth Circuit noted that no governing precedent of *any* court has held that a suspect is in custody once he has been advised of his freedom to leave or terminate questioning. *Id.* at 826. Likewise, in *Czichray* the suspect was subjected to conditions which were much more coercive than anything which was presented in this case. There, the suspect was interviewed for seven hours in his own home in his t-shirt and boxer shorts after two FBI agents appeared at his front door at 6:30 a.m. They gave him the *Griffin* warnings, but refused to allow him to use the telephone or to call his office or anyone else during the interview. Wherever he went within the home, one of the agents accompanied him. Although the agents did not physically strong-arm the suspect during the interview, they did make verbal threats to him about involving his elderly father and his business associates in the investigation. Despite all this, the Eighth Circuit held the interview was non-custodial. The Court dismissed the officer's refusal to allow the suspect to use the telephone as an indicia of custody: "that a suspect is discouraged from using a telephone in his home during an interview often is not probative of whether he is free to terminate the interview altogether . . .Assuming a reasonable person in Czichray's position would feel that he was not free to use the

---

[11]This finding is made based on *Axsom* which suggests only the atmosphere of the interview, not the atmosphere of the search which is being simultaneously conducted, should be considered. "While the execution of the search warrant was certainly police-dominated, the interview . . was not." *Axsom,* 289 F.3d at 503. Agent Scherer testified that Detective Kooistra did not remain in the room for the entirety of the short (ten minute) interview. The door was not closed. No voices were raised, no accusations or promises were made, and there was no physical contact.

19

telephone during questioning, he still retained two viable options: conduct an uninterrupted interview with the agents or terminate the interview. . . . [P]lacing certain ground rules on an interview does not preclude a reasonable person from foregoing an interview altogether." *Czichray*, 378 F.3d at 828. Similarly, that Agent Scherer asked Walter to stay in the living room if he wished to remain in the house during the search did not preclude Walter from refusing Scherer's invitation for a private discussion in the bedroom if he did not wish to participate, or from leaving the house if he wished to do so.

Subsequent to *Czichray*, the Ninth Circuit decided *Craighead* upon which Walter relies as persuasive because "the facts of the case are precisely on point with the facts" of this case. The facts, however, are dissimilar in a few important ways. In *Craighead*, the defendant was interviewed in a bare room with the door closed and an officer standing against it. The *Craighead* Court contrasted that setting from an interview in the comfort of one's own bedroom. In *Craighead* the defendant testified he did not perceive the officer who told him he was free to leave spoke for the entirety of officers present. In this case, there was no such testimony. Additionally, Agent Scherer told the occupants of the home they were free to leave while the group was assembled in the living room and (as the photos reveal) while the other officers were either present or only a few feet away. Additionally, Ninth Circuit seems to have adopted a view which is contrary to the Eighth Circuit by (1) considering as persuasive whether the atmosphere of the *search* as opposed to the *interview* was police dominated; and (2) finding that a person could reasonably believe he had been formally arrested or restrained to a degree associated with a formal arrest even after having been explicitly advised he was not under arrest, was free to leave, and could decline to answer questions.

Considering the totality of the circumstances that confronted Walter on June 2, 2008, a reasonable person in his position would not have understood his situation to have been that of a formal arrest or restraint on his freedom of movement to the degree associated with a formal arrest. *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004). The interview, therefore, was non-custodial and no *Miranda* warnings were required. Walter's statements should be admissible.

## CONCLUSION

For the reasons more fully explained above, it is respectfully RECOMMENDED to the District Court that Defendant's Motion to Suppress Statements (Doc. 24) be **DENIED**.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

*Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990)
*Nash v. Black*, 781 F.2d 665 (8th Cir. 1986)

Dated this __4__ day of November, 2009.

BY THE COURT:

John E. Simko
United States Magistrate Judge

ATTEST:

JOSEPH HAAS, Clerk

By _____ Deputy

(SEAL)